















GEP   3/4/05   18:05

3:05-CV-00436   ISRAEL TECHNOLOGY V. NOVATEL WIRELESS INC

*1*

*CMP.*

# ● ORIGINAL ●

Matthew A. Becker, Esq., (SB# 190748)   FILED
**THE LAW OFFICE OF MATTHEW A. BECKER, PC**
1003 Isabella Avenue
Coronado, California 92118            05 MAR -4 PM 12: 12
Telephone: (619) 522-6760
Facsimile: (619) 522-6763            CLERK, U.S. DISTRICT COURT
                                     SOUTHERN DISTRICT OF CALIFORNIA

Attorney for Plaintiff,
Israel Technology Trading, Inc.      BY:                    DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISRAEL TECHNOLOGY TRADING, INC., a Delaware Corporation,<br><br>           Plaintiff,<br><br>    v.<br><br>NOVATEL WIRELESS, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,<br><br>           Defendants.<br>_____ | CASE NO.:<br><br>**'05 CV 436 BEN (JFS)**<br><br>**COMPLAINT for:**<br><br>1. **FEDERAL UNFAIR COMPETITION FALSE ADVERTISING LANHAM ACT 43(A)(1)(B)**<br>2. **BREACH OF WRITTEN CONTRACT;**<br>3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>4. **TORTIOUS INTERFERENCE WITH CONTRACT;**<br>5. **UNFAIR BUSINESS PRACTICE CAL. BUS. & PROF. CODE §§ 17200 et seq.; and**<br>6. **UNJUST ENRICHMENT.** |

    Plaintiff, ISRAEL TECHNOLOGY TRADING, INC., a Delaware

corporation, (hereinafter "ITT" or "Plaintiff"), hereby submits

its Complaint for damages and relief against NOVATEL WIRELESS,

INC., a Delaware corporation, (hereinafter "Novatel" or

"Defendant") and DOES 1 THROUGH 10, (hereinafter collectively

"Defendants") and alleges as follows:

///

The Law Office of
Matthew A. Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-1-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

## GENERAL ALLEGATIONS

### THE PARTIES

1.   Plaintiff is a Delaware corporation with its principal place of business at 1050 Wall Street, Ste. 202, Lyndhurst, NJ 07071.

2.   Upon information and belief, Defendant NOVATEL WIRELESS, INC., is a Delaware corporation with its principal place of business at 9255 Towne Centre Drive, Ste 225 San Diego, CA 92121 San Diego, California.

3.   The true identity and locations of the DOE Defendants are presently unknown at this time.

### JURISDICTION AND VENUE

4.   This is a civil action arising under the Lanham Act. Accordingly, this court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  Supplemental jurisdiction is also established pursuant to 28 U.S.C. § 1367, with respect to any claims forming part of the same case or controversy.

5.   This is a civil action in which the acts, events, contracts and/or breaches herein alleged occurred within this judicial district.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and pursuant to agreement of the Parties.

### ALTER EGO

6.   Plaintiff is informed and believes, and on that basis alleges, that the Defendants were at all times relevant the partners, officers, agents, assignees, successors-in-interest, co-conspirators, principals, alter egos, or employees of each other

The Law Office of
Matthew A Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

1  or were otherwise responsible for, contributed to, or participated

2  in the acts and omissions alleged herein, and thereby incurred

3  liability therefore.

4      7.   Plaintiff is informed and believes, and on that basis

5  alleges that Defendants among other things (1) commingled funds

6  and other assets; (2) diverted corporate funds between entities or

7  to other than corporate purposes; (3) treated corporate assets as

8  personal assets; (4) failed to observe corporate formalities; (5)

9  failed to maintain an arms-length relationship with the

10 corporation or between entities; and (6) failed to maintain

11 adequate capitalization.  Adherence to the fiction of the separate

12 existence of the Defendants would permit an abuse of the corporate

13 privilege sanction, fraud, and promote injustice.

14                        **BACKGROUND FACTS**

15     8.   In January 2002, the CEO of Novatel Wireless, Inc., Mr.

16 John Major, contacted Mr. Joe Shayovitch, President and sole

17 shareholder of Israel Technology Trading, Inc., and requested that

18 ITT represent Novatel in Israel.

19     9.   At this time, ITT was informed that Novatel was the

20 first company with a GPRS modem in the market and Novatel sought

21 ITT for introduction and distribution of the modem in Israel.

22     10.  Novatel was aware that Mr. Shayovitch is a well-known

23 figure in the wireless market with over twenty (20) years

24 experience.  More importantly to Novatel, Mr. Shayovitch and his

25 companies have substantial contacts in the Israeli wireless

26 market.

27     11.  In 2002, Novatel needed such contacts to break into the

28 Israeli market and therefore sought to do business with ITT.

The Law Office of
Mathew A. Becker, P C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-3-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

12.   The decision for ITT to take on Novatel as a customer was difficult as Novatel was a relatively unknown brand in Israel and ITT's reputation would be at stake in endorsing the relevant products.   Furthermore, ITT was required to make major investments to penetrate the Israeli market particularly because the Novatel modems required government certification as well as significant promotional expenses.

13.   After much consideration, ITT agreed to accept Novatel's offer based upon two conditions: (1) that ITT be the exclusive distributor in Israel, and (2) that in the event that the distribution agreement between the parties was terminated, Novatel would not sell directly in Israel but through a distributor.

14.   Mr. Major and Novatel agreed and formalized the relationship with a written distribution agreement (hereinafter "Agreement" - See Exhibit "A" Attached).   On May 24, 2002, ITT and Novatel executed their Agreement whereby Novatel agreed that ITT would be the exclusive distributor in Israel and that Novatel would not sell directly or indirectly in the Israel territory.

15.   In the event of any sales where ITT is not used, ITT is contractually entitled to the commission that would have been gained if ITT had ordered, received and sold the product.

16.   The Agreement was clearly for distribution of all of Novatel's then existing and future products.   See Exhibit A attached (section 2.05 of the Agreement).   Novatel abided by this provision in the transition from the G201 to G301 modem.   This type of provision is also necessary as wireless technology is constantly changing which can result in new products and innovations every six to eight months.

The Law Office of
Matthew A Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-4-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

17.  After execution of the Agreement, ITT began the introduction and distribution of the modem in Israel.  During this time, ITT communicated directly with the two most important GPRS operators in Israel, namely, 1) Cellcom and 2) Partner (also known as Orange).

18.  Immediately thereafter, ITT discovered that Novatel had concealed information, which would be problematic to ITT's distribution.  At execution of the Agreement, Novatel was selling CDPD modems directly to Cellcom.  However, Novatel did not inform ITT that Cellcom was very unsatisfied with Novatel's serious lack of customer service and support.

19.  As a result, ITT was forced to invest substantial time and resources to address and service the problems surrounding the CDPD modems just to get to the point where Cellcom would consider the Novatel GPRS G201 modem.  ITT made this investment of time and resources even though it had no connection with the sale of these previous modems and received no compensation.

20.  Based upon ITT's focus and performance, Cellcom was convinced to consider the Novatel G201 and began the certification process.  In fact, at the time, Cellcom already had begun the certification process on competing products from Sierra.

21.  While ITT was presenting itself as the exclusive distributor to both Cellcom and Partner, another Novatel distributor, "Tritech," surfaced and also claimed to be a distributor of Novatel.  Novatel sent a written denial to Partner claiming no association with Tritech.  Tritech in turn presented Partner with proper documentation evidencing that Tritech was in fact a legitimate distributor of Novatel.  This significantly

The Law Office of
Matthew A. Becker, P.C.
1005 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-5-

1  damaged the images of both Novatel and ITT and forced ITT to
2  invest significant resources in damage control.  Novatel
3  acknowledged that two different departments within Novatel had
4  appointed two different distributors without coordination.

5      22.  Notwithstanding the above issues surrounding Novatel's
6  credibility, ITT was committed to the project and had already
7  invested substantial resources and sought to cure these issues.
8  Because of the reputation and goodwill of ITT, both Cellcom and
9  Partner eventually agreed to work on the certification of
10 Novatel's modem with ITT.

11     **NOVATEL'S MISLEADING INFORMATION REGARDING THE G201 MODEM**

12     23.  ITT had no prior experience with the G201 and relied on
13 Novatel for guidance.  Novatel informed ITT verbally and in
14 writing that the G201 at the time was already certified in the UK
15 and was bug free.  Based on this, Novatel estimated that the G201
16 certification process by Cellcom and Partner would be two (2) to
17 three (3) weeks at most.

18     24.  Based upon this information, ITT budgeted $5000 - $7000
19 for the certification process for each Cellcom and Partner.
20 However, Novatel concealed that during the UK certification, many
21 problems were discovered with the modem resulting in thousands of
22 returns at a significant cost to the UK distributor.

23     25.  These problems carried over into the Israel
24 certification as well.  Due to problems, the G201 certification
25 process with Partner took ITT engineers seven (7) months of daily
26 intensive work.  With Cellcom, the certification process took nine
27 (9) months.  Each of these certifications resulted in actual costs
28 to ITT of at least $50,000 for a total of at least $100,000.

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

**EXTENSION OF EXCLUSIVE DISTRIBUTION AGREEMENT**

26. Due to Novatel's G201 modem problems and misleading information and advertisements about the G201 modem status, ITT invested extensive time and money in certifying the G201 modem.

27. Not only was it costly, but ITT had already used one year of its two year exclusivity in the certification process. As such, when Novatel then introduced the G301 modem in November 2002, ITT informed Novatel in writing that it would not go through the same long process of certification without a two year extension of the exclusive distribution agreement.

28. On December 11, 2002, pursuant to Section 6 of the Agreement relating to renewals, Novatel and ITT agreed in writing via email to extend the Agreement until May 23, 2006. See Exhibit "B" attached herewith.

29. Thereafter, ITT proceeded in good faith to fulfill its obligations under the Agreement. Based upon the two years written extension of the exclusivity, ITT continued to invest in the promotion of Novatel modems in Israel. Additionally, ITT embarked on the costly certification of the G301 modem with Cellcom and Partner.

**NOVATEL'S MISLEADING INFORMATION, FAILURE TO PROVIDE SERVICE AND SUPPORT, PRODUCT DEFECTS, CERTIFICATION PROBLEMS - PARTNER**

30. In October 2002, after seven months of extensive effort and investment, Partner certified the G201 and Partner ordered the first 500 modems. Once the first 500 modems were delivered to Partner, ITT received numerous telephone calls and emails from Partner complaining about the G201 modem.

///

The Law Office of
Matthew A. Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-7-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

31.   ITT engaged in intense damage control, collecting all 500 modems and worked with Novatel to repair and reload the modems.   Because of ITT's commitment and support, Partner remained trusting in Novatel.   However, ITT was forced to expend time and resources to maintain the client.   Contrary to its representations made to ITT and customers, Novatel seriously lacked in providing any support or replacement for the defective products.   As a result, ITT suffered direct and actual damages.

32.   Partner originally agreed with ITT to purchase a minimum of 500 modems every 2 months but as result of the G201 failures in the initial shipment, Partner immediately cancelled future orders for the G201 and placed orders for the Sierra competitive brand instead.   Partner was extremely displeased that the Novatel products did not operate as advertised and felt mislead.

33.   Novatel shipped the G201 with actual knowledge of the defects (previously discovered in the UK shipments).   Novatel was motivated to meet certain shipping goals for the 2002 year end and sacrificed quality and customer service.   Novatel did not in good faith attempt to address these defective issues as required by the Agreement.

34.   Novatel expended its efforts trying to convince ITT and Partner that the products were fine just used improperly.   It took weeks for Novatel to test the exact product shipped and admit the problems.   The misrepresentations, denials and unprofessional handling of these issues was the cause of Partner seeking all of its future products from a competitor.   Only in early 2004 was ITT able to sell Partner a new shipment of 350 G301 modems.   This caused ITT to suffer damages including $50,000 for investment in

-8-

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

1  certification of the G201, and lost revenues of at least $375,000

2  per year from the lost sales to Partner.

3  **MISLEADING INFORMATION PROVIDED BY NOVATEL - CELLCOM**

4  35.   While the G201 certification effort for Cellcom was in

5  process in August 2002, Novatel made an announcement and began

6  advertising its upcoming G301.  Cellcom immediately contacted ITT

7  and inquired if the G201 would be discontinued once the G301 was

8  for sale.  Cellcom was concerned that if the G201 was

9  discontinued, the certification efforts would be pointless.  This

10  concern was compounded in light of all of the problems with the

11  G201 modem and the difficulties in certification.  ITT forwarded

12  these concerns in writing to Novatel.

13  36.   Novatel responded verbally and in writing that the

14  Novatel strategy is "multi-tier" products with the G201 being a

15  lower priced product and the G301 a more expensive one.  Based

16  upon this Novatel pressed ITT to continue its efforts and

17  investments with Cellcom related to the G201 certification.

18  37.   The facts indicate that Novatel never intended to

19  continue selling the G201 as at the time Novatel had already

20  stopped manufacturing the G201 and all it wanted was to sell its

21  inventory before the G301 was made available.  Novatel falsely

22  advertised that the G201 would be available but only intended to

23  flush its inventory in favor of new products.

24  38.   Novatel in fact discontinued the G201 after the

25  release of the G301 breaching its Agreement with ITT and its

26  representations.  This intentional deception by Novatel severely

27  damage ITT's credibility.  Not only did ITT continue its

28

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

**COMPLAINT OF ISRAEL TECHNOLOGY TRADING**

1 investment in the G201 certification but Cellcom relied upon ITT's

2 claim that the G201 would not be discontinued.

**CANCELLATION OF CELLCOM PURCHASE AGREEMENT**

4     39.   In December 2002, Cellcom certified the G201 and in

5 January 2003, Cellcom ordered the first 500 G201 modems from ITT.

6 ITT placed the order with Novatel at a price that was approved by

7 Novatel management in writing and a Novatel sales executive

8 confirmed the order in writing.

9     40.   ITT then confirmed the order to Cellcom and waited for a

10 delivery date confirmation from Novatel.   With encouragement from

11 ITT, and with an ITT track record of outstanding support, with

12 GPRS certification and outstanding service and performance of over

13 $500,000 worth of Novatel CDPD modems sold by ITT to Cellcom in

14 2002, Cellcom decided to switch to Novatel for all of its GPRS

15 modem needs at a minimum of 1000 modems per month.

16     41.   During this time, Novatel underwent management changes

17 and the CEO was replaced.

18     42.   Without any warning, and contrary to its written

19 commitment just a few weeks earlier, Novatel informed ITT that it

20 was discontinuing the G201 in light of the new G301.   Moreover,

21 Novatel informed ITT that it did not have enough G201 modems to

22 fill the Cellcom order.   ITT had to inform Cellcom that it could

23 not fill its order.

24     43.   ITT later found out that Novatel was untruthful and at

25 the time Novatel had over 5000 G201 modems in stock and sold them

26 to a third party in China.   ITT has obtained copies of the

27 respective documentary proof of this sale.

28 ///

The Law Office of
Matthew A Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-10-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

44.  As a result of the misrepresentations and breach by Novatel, ITT suffered huge customer dissatisfaction, damage to its reputation and monetary damages including $70,000 for investment in certification of the G201, $75,000 loss on the 500 G201 modems ordered, and lost revenues of $1,500,000 from the lost future agreed upon sales to Cellcom per year.

**MISREPRESENATIONS - G301 MODEM CERTIFICATION - CELLCOM**

45.  In January 2003, Novatel introduced the G301 modem with a voice option (meaning a user could place a cell phone call via the modem).

46.  Novatel provided ITT with 5 G301 modems to be submitted to Cellcom for certification.  The G301 had numerous problems similar to its predecessor the G201.  After eight (8) months of efforts, substantial costs and perseverance, ITT was able to get the modem certified with Cellcom.  In October 2003 Cellcom placed an order for 400 modems which ITT submitted to Novatel.

47.  At this time, Novatel informed ITT that the modem which was tested and certified was manufactured in Mexico and was no longer available.  A new modem without the voice option was manufactured in Korea and was the new G301 modem Novatel was offering.

48.  Once again, Novatel intentionally misled ITT.  Novatel advertised a product that it knew it could not sell.  Novatel knew that Cellcom and ITT were testing and certifying the version that no longer existed and provided no warning to ITT.  Instead, Novatel let ITT and Cellcom continue spending time, money and resources testing and certifying a product that could not be sold.

///

The Law Office of
Matthew A Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-11-

**COMPLAINT OF ISRAEL TECHNOLOGY TRADING**

1    49.  Once notified by Novatel that the new G301 had no voice
2  and was a different hardware version, ITT was forced to send the
3  new G301 modem to Cellcom for re-test and re-certification.

4    50.  After three (3) months of continually failing tests,
5  Novatel then informed ITT in writing in November 2003 that it was
6  withdrawing support for the substandard G301 in favor of the new
7  UMTS modem.

8    51.  As a result of Novatel's actions, ITT suffered damages
9  of $90,000 for investment in certification of the G301, a $52,000
10  loss on the 400 G301 modems ordered, and lost revenues of
11  $1,300,000 per year from the loss of future sales to Cellcom.

12        **BREACH OF EXCLUSIVITY – SALES TO PARTNER AND CELLCOM**

13    52.  In the third quarter of 2003, Novatel announced the
14  commercial availability of the 3G/UMTS modem ("U530").  The new
15  U530 modem was advertised by Novatel's website as an available
16  Novatel product.

17    53.  ITT immediately informed Novatel that pursuant to the
18  Agreement, it wished to distribute the new modem in Israel.
19  Novatel executives responded in writing to ITT that at this point
20  "Israel is to small of a market for Novatel to focus on and going
21  forward," Novatel requires a minimum order of 10,000 modems for
22  the U530.

23    54.  All of the above events occurred 9 months before the
24  expiration of the first two years exclusivity period.  ITT has now
25  learned that at the time, Novatel had already made the U530
26  available to all or nearly all of its European distributors.
27  ///
28  ///

The Law Office of
Matthew A. Becker, P.C.
1001 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

**COMPLAINT OF ISRAEL TECHNOLOGY TRADING**

55.  Based upon the above, it appears that Novatel was simply looking for an excuse to avoid its contractual obligations to ITT to avoid having to pay any compensation to ITT.

56.  ITT continued to pressure Novatel to sell this new UMTS modem in Israel as ITT had substantial interest from both Cellcom and Partner.  Specifically, ITT informed Novatel that ITT had reached an agreement with Cellcom and Partner for each to purchase 100 U530 modems for a pilot test of their new G3 networks without any certification requirements.

57.  Novatel did not allow ITT to distribute the U530 in direct violation of Section 2.05 of the Agreement.  However, ITT was determined to distribute the product and sought customers in Israel and continued speaking to Novatel management.

58.  ITT reiterated to Novatel that both Cellcom and Partner were interested in the new modem beyond the initial 100 piece order.  Despite these efforts, ITT was continually informed that the Israeli market was far too small for the U530 modem.

59.  In August 2004, ITT became aware that Novatel in partnership with Lucent Technologies, Inc., was selling the modems directly to the same Israeli customers developed by ITT (Cellcom and Partner).  These sales occurred despite Novatel's representations just a few months prior that the market was too small for Novatel to support and despite the exclusive agreement with ITT.

60.  Cellcom and Partner were only made aware and became interested in the U530 modem as a result of ITT's efforts.

61.  Novatel initially sold 500 U530 modems to Partner and 500 U530 modems to Cellcom.  ITT believes that Novatel has

The Law Office of
Matthew A Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

1  continued to sell directly to both Partner and Cellcom.  As a

2  result, ITT suffered immediate damages of $75,000 from the lost

3  sales to Partner, $75,000 from the lost sales to Cellcom, and lost

4  future revenues of $2,500,000 for lost sales between the two

5  operators per year.  Moreover, even after the direct purchase of

6  these U530 from Novatel/Lucent, Partner has continued to contact

7  ITT for support and purchase of additional U530.  These contacts

8  occurred as recent as January 2005.  Based upon emails from

9  Partner, it appears that Novatel misled Partner telling them that

10 the reason that the initial sale was through Lucent/Novatel and

11 not ITT was based upon Lucent's "new" exclusivity on the U530

12 modem.  Once again, Novatel seems to be entering into conflicting

13 agreements and when confronted, always has a new explanation or

14 reason.

15 **ITT'S REMAINING INVENTORY OF NOVATEL MODEMS**

16 62.  By advertising and selling directly to the Israeli

17 operators, Novatel has undermined ITT's efforts and credibility

18 with both Partner and Cellcom.

19 63.  Partner and Cellcom now falsely believe that ITT is no

20 longer the Novatel exclusive distributor and no longer will do

21 business with ITT.  This has caused damage to ITT in amounts to be

22 proven at trial.

23 64.  ITT is currently stocked with an unsold inventory of

24 G301 modems of over $20,000 and CDPD modems of over $3,000.

25 **FAILURE TO PROVIDE SUPPORT AND SERVICE**

26 65.  Novatel is contractually committed to service and

27 support for the products sold to ITT for a period of 26 months

28

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-14-

1 from date of shipment.  Novatel advertises that it provides both

2 service and support to its customers.

3     66.  ITT has advertised and committed to support its

4 customers for the same period.

5     67.  During the past six (6) months Novatel has practically

6 ceased all support to ITT and ITT customers.  Novatel has ignored

7 requests for service for products under warranty.

8     68.  As a result, ITT has suffered significant damage as ITT

9 is committed contractually to service its customers.  Both Cellcom

10 and Partner as well as other customers continue to seek service

11 and support from ITT and continue to return faulty modems to ITT

12 for exchange or repair.

13     69.  These false promises are misleading to customers and

14 Novatel's lack of support has caused significant expenses to ITT

15 and has further damaged ITT's reputation leaving ITT open to

16 liability from its customers.

17 **FIRST CAUSE OF ACTION**

18 **Federal Unfair Competition- False Advertising under §43(a)(1)(B)**

19 **(Against all Defendants)**

20     70.  Plaintiff hereby incorporates by reference and

21 realleges each of the allegations contained in paragraphs 1

22 through 69 above, as though fully set forth herein.

23     71.  As indicated above, in an effort to sell its products,

24 Novatel has made significant false and misleading public

25 statements and advertisements to ITT, to customers and to

26 potential customers.

27     72.  Such conduct by Defendants, namely false statements of

28 fact regarding its products, service and support, are likely to

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-15-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

1  cause confusion, mistake or deception to the purchasing public
2  with respect to said representations, and such deception is
3  material, in that it is likely to influence the purchasing
4  decision.

5       73.  Defendants have caused the falsely advertised goods to
6  enter interstate commerce.

7       74.  Defendants have obtained gains, profits, and advantages
8  as a result of their unlawful acts.

9       75.  Both Plaintiff and Defendants are engaged in the
10  competitive business of providing wireless products.

11      76.  Defendants' representations as stated herein constitute
12  commercial speech and were employed specifically for the purpose
13  of influencing consumers to buy Defendants' product.

14      77.  Plaintiff has been and continues to suffer irreparable
15  damages resulting from Defendants' unlawful conduct, including,
16  but not limited to, damage to goodwill, loss of customers and the
17  direct diversion of consumers and accompanying sales from
18  Plaintiff to the Defendants.  Accordingly, Defendants' conduct is
19  unlawful in violation of § 43(a)(1)(B) and Plaintiff is entitled
20  to damages as may be proven at trial.

21                    **SECOND CAUSE OF ACTION**

22                    **BREACH OF WRITTEN CONTRACT**

23                    **(Against all Defendants)**

24      78.  Plaintiff refers to and incorporates, as though
25  fully set forth herein, Paragraphs 1 through 77 above.

26      79.  As indicated above, Plaintiff and Defendants entered
27  into an Agreement for the exclusive distribution of Defendants'
28  wireless products in the territory of Israel.  The Agreement was

The Law Office of
Matthew A. Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-16-

1  extended for an additional two (2) year period.

2      80.   Plaintiff has fully performed all conditions, covenants,

3  and promises under all the written contracts, on its part to be

4  performed.

5      81.   Defendants have breached the Agreement on numerous

6  occasions as more fully set forth above.  Although Plaintiff has

7  demanded fully performance by Defendants, Defendants continue to

8  breach the Agreement as indicated herein.

9      82.   As a direct, proximate and consequential result of the

10  breach of the Agreement, Plaintiff has been damaged in a sum to be

11  determined at trial.

12              **THIRD CAUSE OF ACTION**

13  **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

14              **(against all defendants)**

15      83.   Plaintiff refers to and incorporates, as though

16  fully set forth herein, Paragraphs 1 through 82 above.

17      84.   As set forth above, Defendant has significantly,

18  materially and intentionally breached its Agreement with

19  Plaintiff.

20      85.   Notwithstanding demand for performance by Plaintiff,

21  Defendant has continued its breaches.

22      86.   Through such actions, Defendant has constructively

23  failed to cooperate with Plaintiff in the performance of all

24  contracts and thereby, breached the implied covenant of good faith

25  and fair dealing respectively.

26      87.   As a direct, proximate and consequential result of

27  Defendants' acts, Plaintiff has been damaged in the sums to be

28  determined at trial.

The Law Office of
Matthew A. Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-17-

**COMPLAINT OF ISRAEL TECHNOLOGY TRADING**

**FOURTH CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH CONTRACT**

**(against all defendants)**

88.  Plaintiff refers to and incorporates, as though fully set forth herein, Paragraphs 1 through 87 above.

89.  As outlined above, Plaintiff entered into various valid and binding contracts with customers such as Cellcom and Partner for purchase of Novatel products.  Defendants were well aware of such contracts.

90.  By the acts described herein, Defendants intended and did induce a breach of such contracts.  Defendants' intentional acts were the direct and proximate cause of such breaches and disruption of the contracts with the third party customers.

91.  As a direct, proximate and consequential result of Defendants' intentional tortious interference with the contracts outlined herein, Plaintiff has been damaged in a sum to be determined at trial.

**FIFTH CAUSE OF ACTION**

**UNFAIR BUSINESS PRACTICE**

**CAL. BUS. & PROF. CODE §§ 17200 et seq.**

**(Against all Defendants)**

92.  Plaintiff hereby incorporates by reference and realleges each of the allegations contained in paragraphs 1 through 91 above, as though fully set forth herein.

93.  Defendants conduct as alleged above constitutes unfair competition and unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

///

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

-18-

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

1  94.  As a direct and proximate result of Defendants' conduct

2  Plaintiff has been and continues to be irreparably damaged.

3  95.  Therefore, Plaintiff is entitled to injunctive relief

4  whereby Defendants shall cease such unlawful business practices

5  and an award of damages as provided pursuant to Cal. Bus. & Prof.

6  Code § 17203.

**SIXTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(against all defendants)**

10  96.  Plaintiff refers to and incorporates, as though

11  fully set forth herein, Paragraphs 1 through 95 above.

12  97.  As set forth above, Defendants have received valuable

13  consideration from the efforts of Plaintiff in an amount to be

14  determined at trial.

15  98.  Notwithstanding demand for payment, Defendants have

16  failed to compensate Plaintiff for its efforts.

17  99.  As a direct, proximate and consequential result of these

18  acts, Defendant has effectively been unjustly enriched at

19  Plaintiff's expense in an amount to be determined at trial.

**PRAYER FOR RELIEF**

21  **WHEREFORE**, Plaintiff prays for judgment in its favor and

22  against the Defendants on all causes of action as follows:

23  1.  For compensatory, incidental and consequential damages

24  in an amount to be proven at trial but at least $5,000,000,

25  together with interest at the maximum rate allowable by law, and

26  allowable costs;

27  2.  For restitution to Plaintiff based upon Defendants'

28  unlawful acts;

-19-

**COMPLAINT OF ISRAEL TECHNOLOGY TRADING**

The Law Office of
Matthew A. Becker, P.C.
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

3.   For an award of Defendants' profits, Plaintiff's actual damages and enhanced damages as a result of the Lanham Act violations;

4.   For an award of punitive damages against Defendants in an amount to be determined at trial for Defendant's willful, intentional and malicious acts as may be allowable under the law;

5.   For an award to Plaintiff for reasonable attorneys' fees as permitted under the law and by the Agreement;

6.   For an award of the costs of this action together with pre and post judgment interest;

7.   Such other and further relief as the Court may see just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues triable by a jury.


Dated: March 4, 2005          Respectfully submitted,

THE LAW OFFICE OF MATTHEW A. BECKER, PC


By: _Matt A. Bel_____
    Matthew A. Becker, Esq.
    Attorney for Plaintiff
    Israel Technology Trading, Inc.

The Law Office of
Matthew A. Becker, P.C
1003 Isabella Avenue
Coronado, CA 92118
P (619) 522-6760
F (619) 522-6763

COMPLAINT OF ISRAEL TECHNOLOGY TRADING

CONFIDENTIAL                    DISTRIBUTORNSHIP AGREEMENT . – NOVATEL WIRELESS

## DISTRIBUTORSHIP AGREEMENT

THIS DISTRIBUTORSHIP AGREEMENT is made as of the 24TH day of   May , 2002, by and between Israel Technology Trading Inc.,  a Delaware Registered Company, with its principal place of business at 1050 Wall Street,   Suite 320 Lyndhurst, NJ   07071 and Hamapilim 20 Ramat hasharon, Israel ("Distributor") and NOVATEL WIRELESS, INC., organized under the laws of Delaware with its principal place of business at 9360 Towne Center Dr. Ste. 110, San Diego, CA.  92121 ("Supplier").

### ARTICLE 1
### DEFINITIONS

When used in this Agreement, the following terms shall have the respective meanings indicated, such meanings to be applicable to both the singular and plural forms of the terms defined:

Section 1.01.    "Agreement" means this agreement, and the Exhibits, together with all amendments thereto.

Section 1.02.    "Customer" means any person who purchases or leases Products from Distributor or end-user of Products.

Section 1.03.    "Exhibit" means any exhibit attached to this Agreement.

Section 1.04.    "Products" means those items described in Exhibit A as well as any Updates to those items that are made commercially available.

Section 1.05.    "Proprietary Rights" means all rights in the Products and Supplier's Confidential Information, including, but not limited to, patents, copyrights, authors' rights, trademarks, tradenames, know-how and trade secrets, irrespective of whether such rights arise under U.S. or international intellectual property, unfair competition or trade secrets law.

Section 1.06.    "Sales Incentives" means those certain sales incentives, rebates and credits, if any, as set forth in Exhibit A.

Section 1.07.    "Shipping Point" means Supplier's distribution facility located in Mexico; and such other locations in North America as may be changed or added by Supplier in its sole discretion upon thirty (30) days prior written notice to Distributor.

Section 1.08.    "Specifications" means those specifications for the Products set forth on the Novatel Wireless Website (www.novatelwireless.com) and on supplier data sheets.

Section 1.09.    "Subsidiary" means any person, corporation or other entity: fifty percent (50%) or more of any class of the voting stock of which Supplier, owns, now or hereafter, directly or indirectly, or of which Supplier, is, now or hereafter, directly or indirectly, in control.

Section 1.10.    "Territory" means the geographic area or areas described in Exhibit B attached hereto.

Section 1.11.    "Trademark" means any trademark, logo, service mark or other commercial designation, whether or not registered, used to represent or describe the Products of Supplier, as set forth in Exhibit C.

Section 1.12.   "Updates" means new versions, including maintenance releases, and localizations and translations thereof, of a Product that contain bug fixes, error corrections and minor enhancements, but not containing major enhancements or significant new functionality, as determined in Supplier's sole reasonable discretion, and any related documentation.

Section 1.13.   "Upgrades" means new versions of a Product that contain major enhancements and significant new functionality, including localizations and translations thereof, as determined in Supplier's sole reasonable discretion, and any related documentation.

**ARTICLE 2**
**APPOINTMENT OF DISTRIBUTOR**

Section 2.01.   <u>Appointment and Exclusivity</u>.  Subject to the terms, conditions and restrictions of this Agreement, Supplier hereby appoints Distributor as Supplier's **Exclusive** Master Distributor of Products in the Territory and Distributor accepts that position, subject to the terms and conditions of this Agreement.  For the avoidance of doubt, Distributor hereby agrees that neither Distributor nor any of its affiliates may directly or indirectly distribute, sell, or otherwise dispose of the Products anywhere other than in the Territory, nor may Distributor (or any of its affiliates) directly or indirectly facilitate  the subsequent sale or other disposition of the Products anywhere other than in the Territory.  Distributor hereby agrees that during the term of the Exclusive, Distributor shall not sell any wireless CDPD or GPRS modems other than the Products purchased from Supplier.  Distributor must request the right to sell other CDPD or GPRS products in writing to Supplier.  Supplier is to grant or deny Distributor the right to sell any GPRS based products. Further more, Supplier cannot and will not sell directly into the Distributor's territory listed in Exhibit B. If it does happen Distributor shall receive the commission that would have been gained if Distributor had ordered, received and sold the product.

Section 2.02.   <u>Relationship of Parties</u>.

   A.   Distributor is an independent contractor and is not the legal representative or agent of Supplier for any purpose and shall have no right or authority (except as expressly provided in this Agreement) to incur, assume or create in writing or otherwise, any obligations over Supplier or its employees. Distributor shall, at its own expense, during the term of this Agreement and any extension thereof, maintain such insurance covering all persons employed by and working for it in connection with the performance of this Agreement as is necessary and appropriate under applicable laws of jurisdictions existing in the Territory, and upon request shall furnish Supplier with satisfactory evidence of the maintenance of such insurance.

   B.   Nothing contained in this Agreement shall be deemed to create any partnership or joint venture relationship between the parties.

Section 2.03.   <u>Advertising and Marketing</u>.  Distributor shall be entitled, during the term of the distributorship created by this Agreement and any extension thereof, to advertise and hold itself out as an authorized Master Distributor of the Products, as set forth in <u>Exhibit D</u>.  At all times during the term of the distributorship created by this Agreement and any extension thereof, Distributor shall be entitled to use the Trademarks in all advertisements and other reasonable activities conducted by Distributor to promote the sale of the Products.  Distributor shall submit examples of all proposed advertisements and other promotional materials for the Products to Supplier for inspection and Distributor shall not use any

such advertisements or promotional materials without having received the prior written consent of Supplier to do so, such consent not to be unreasonably withheld. Distributor shall use commercially reasonable efforts to market, promote, and distribute the Products. Distributor's use of the Trademarks in any advertising and promotional media is conditioned upon Distributor's compliance with Supplier's approval requirements set forth above, as well as Distributor's agreement to appropriately indicate that such Trademarks are Supplier's Trademarks.   Distributor will ensure that Products and related documentation incorporate copyright and other proprietary notices in the same manner that Supplier incorporates such notices in the Products, or in any manner reasonably requested by Supplier. Distributor will not remove any copyright or other proprietary notices incorporated on or in the Products by Supplier. Supplier shall own all of the rights with respect to the Trademarks. Distributor shall not, pursuant to this Agreement or otherwise, have or acquire any right, title or interest in or to Supplier's Trademarks. The use by Distributor of the Trademarks is authorized only for the purposes set forth herein and upon termination of this Agreement, for any reason, such authorization will cease. Upon termination of this Agreement for any reason, except for the sole purpose of selling any Products remaining in Distributor's inventory, Distributor will immediately cease all use of the Trademarks, and, at Distributor's election, destroy or deliver to Supplier all materials in Distributor's control or possession which bear such Trademarks, including sales literature. At no time during or after the term of this Agreement will Distributor challenge or assist others to challenge the Trademarks or the registration thereof, or attempt to register any trademarks, marks or trade names confusingly similar to those of Supplier.

Section 2.04.   <u>Proprietary Rights</u>.  Supplier and Distributor acknowledge and agree that Supplier owns all of the Proprietary Rights. The use by Distributor of the Proprietary Rights is authorized only for the purposes herein set forth and upon termination of this Agreement, for any reason, such authorization will cease.

Section 2.05.   <u>New Products and Upgrades</u>.  If Supplier now or hereafter commercially manufactures or distributes, or proposes to commercially manufacture or distribute, any product which is utilized in wireless communications, other than the Products, or any Upgrades to the Products, Supplier shall, as soon as reasonably possible, notify Distributor of that fact and of all details concerning that product or that Upgrade. Distributor may request from Supplier distribution rights for that product or that Upgrade in the Territory, or any portion thereof, and if so requested, Supplier shall, with respect to any such other products or Upgrades that are generally commercially available from Supplier, grant such distribution rights to Distributor on terms and conditions no less favorable than those provided in this Agreement. [removed MFN concept].   Supplier shall first make that offer in writing to Distributor on terms and conditions, which shall be specified fully in that offer.  That offer shall contain a full description of the subject product or Upgrade and its specifications and pricing.  Distributor may request, and Supplier shall promptly provide further information concerning the product, the Upgrade, or the offer.  Supplier's ability to offer the product or Upgrade to another party for distribution in the Territory shall not be conditioned on Distributor's acceptance or rejection of such an offer to distribute the products or Upgrade.  If Supplier desires to make a better offer to another comparable distributor, assuming comparable quantities of products or Upgrades, Supplier shall make such better offer to Distributor in accordance with the procedure set forth above.

Section 2.06.   <u>Confidential Information</u>.  In performance of this Agreement, it may be necessary or desirable for either party to disclose to the other certain business and/or technical information which the disclosing party regards as proprietary or confidential (the "Confidential Information"). Each party shall treat as confidential all Confidential Information of the other party and shall not use such Confidential Information except as expressly set forth in the Nondisclosure Agreement entered into between the

CONFIDENTIAL DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

parties, and incorporated herein by reference, the effectiveness of which the parties hereby expressly ratify.

## ARTICLE 3
## TERMS OF PURCHASE AND SALE OF PRODUCTS

Section 3.01.    <u>Purchase of Product and Forecast of Demand</u>.  Distributor may, but shall not have the obligation to, purchase from time to time its commercially reasonable requirements for the Products from Supplier.  Distributor shall furnish Supplier with a non-binding, rolling twelve-month Product forecast, mutually reasonably agreed between Supplier and Distributor, indicating, on a month-by-month basis, the quantities of each type of Product Distributor expects to purchase and the desired date ("Delivery Date") by which the Products are to be delivered to the Shipping Point (the "Product Forecast").  Distributor shall use commercially reasonable efforts to ensure that the Product Forecasts accurately represent Distributor's Product needs.  Distributor may make changes to the Product Forecast upon the mutual reasonable agreement between Supplier and Distributor.  Such Product Forecasts shall not be considered firm orders unless followed by a specific Purchase Order (as defined below) from Distributor.

Section 3.02.    <u>Purchases for Resale</u>.  All Products purchased by Distributor shall be purchased solely for commercial resale, excepting those Products reasonably required by Distributor for advertising and demonstration purposes.

Section 3.03.    <u>Order Procedure</u>.  Distributor shall submit to Supplier purchase orders for the Products, reasonably consistent with the Product Forecasts (the "Purchase Orders"), at least thirty (30) days before the Delivery Date set forth in the Product Forecast.  Each Purchase Order shall specify:

      (a)     the types of Product to be delivered;

      (b)     the quantity of each type of Product to be delivered;

      (c)     Distributor's required date of delivery of the Products (the "Specified Delivery Date"), provided, however, that in no event shall the Specified Delivery Date be sooner than thirty (30) days after Supplier receives the Purchase Order;

      (d)     if the Products are to be shipped, the location to which the Products are to be delivered (the "Delivery Location(s)") and the name, address and phone number of any party to which the Products are to be sent (the "Receiving Party");

      (e)     the preferred method of shipping and any special delivery instructions;

      (f)     the SKU and any other Product packaging or labeling requirements; and

      (g)     the name, address and phone number of the person to receive the notice of receipt.

The terms and conditions of this Agreement shall govern all Purchase Orders.  In the event of a conflict between the provisions of this Agreement and the terms and conditions of a Purchase Order, or

Distributor's acknowledgment or other written communications, the provisions of this Agreement, including, but not limited to, the Product Forecast, shall prevail.

Section 3.04.   Issuance and Acceptance of Purchase Orders.  Supplier shall notify Distributor of its acceptance or rejection of a Purchase Order within five (5) business days after Supplier's receipt of the Purchase Order. Supplier shall accept all Purchase Orders that comply with the terms of this Agreement and are consistent with Distributor's Product Forecasts, such forecasts having been mutually reasonably agreed between Supplier and Distributor pursuant to Section 3.01.  Notice of acceptance shall include confirmation of requested quantities, dates and prices, consistent with the terms of this Agreement. Supplier shall use commercially reasonable efforts to accommodate any changes to previously accepted Purchase Orders.
[removed section 3.05 with respect to cancellation of Purchase orders.]

Section 3.06.   Purchase Price.  The prices for the Products, together with any discounts applicable thereto, are set forth in Exhibit A.  All prices are F.O.B. Distributor.  If the price for any Product is not set forth on Exhibit A and Distributor nevertheless orders such a Product from Supplier, the parties hereby evidence their intention thereby to conclude a contract for the sale of that Product at a reasonable price to be determined by the Parties mutually negotiating in good faith.  Except as the Parties may otherwise mutually agree in writing, the prices of all Products hereunder shall not include any Federal, State and local excise, sales, use and other similar taxes and such taxes will appear as additional items on invoices to Distributor. [removed MFN]

Section 3.07.   Price Increases and Reductions.  Supplier reserves the right to increase the prices for the Products, in its sole discretion, but shall provide at least thirty (30) days' prior written notice to Distributor prior to the effective date of any such price increase Supplier reserves the right, in its sole discretion, to reduce the prices applicable to the Products.  Supplier shall give written notice to Distributor of any price increase at least thirty (30) days prior to the effective date thereof. Supplier shall give immediate notice to Distributor of any price decreases.  Products ordered by Distributor or in Distributor's inventory prior to the effective date of such price reduction and in inventory for less than 4 months shall receive the benefit of the new price and Supplier shall issue to Distributor a credit to its account to reflect such credit.  This credit may be utilized at any time, and from time to time, by Distributor in connection with its future orders of Products hereunder.  Distributor agrees to provide Supplier with a report detailing its inventory of Products before any such price protection will be provided by Supplier. [modified price protection to 4 month look back]

Section 3.08.   Packing.  Supplier shall, at its expense, pack all Products in accordance with Supplier's standard packing procedure, which shall be suitable to permit shipment of the Products to the Territory; provided, however, that if Distributor requests a reasonable modification of those procedures (unique packing out of Supplier's norm), Supplier quote Distributor the added cost and upon written approval, shall make the requested modification and Distributor may need to bear and pass on any reasonable expenses incurred by Supplier in complying with such modified procedures which are in excess of the expenses which Supplier would have incurred in following its standard procedures.


Section 3.09.   Title and Risk of Loss; Delivery.

        A.      All deliveries of Products sold by Supplier to Distributor pursuant to this Agreement shall be made F.O.B. Distributor's Shipping Point and title to and risk of loss of Products shall pass from Supplier to Distributor at the Shipping Point.

CONFIDENTIAL                    DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

B.     Supplier shall be responsible for arranging all transportation of Products.

Section 3.10.    Product Receipt.  Promptly upon the receipt of a shipment of Products, Distributor shall examine the shipment to determine whether any item or items included in the shipment are in short supply or materially damaged.  Within five (5) days of receipt of the shipment, Distributor shall notify Supplier in writing of any shortages or damage, which Distributor claims existed at the time of delivery.  Within five (5) days after the receipt of such notice, Supplier will investigate the claim of shortages or damage, inform Distributor of its findings, and deliver to Distributor Products to replace any which are mutually determined were in short supply or materially damaged at the time of delivery.

Section 3.11.    Payment based on approval by Supplier's A/R department.  Upon delivery of Products, Supplier will submit to Distributor Supplier's invoice for those Products.  Distributor shall pay each proper invoice within thirty (30) days after Distributor's receipt of that invoice.  All amounts which are not timely paid by Distributor as required by this Agreement shall be subject to a late charge equal to one and one half percent (1.5%) per month (or, if less, the maximum allowable by applicable law).  When an Operator is the customer of the Distributor special (CURRENT PLUS 30 DAYS) terms may apply.  Supplier must be notified of the terms requirements prior to the shipment of the product to the Operator.  Distributor is to show proof of shipment and a copy of the purchase order placed by the Operator in order to be extended (CURRENT PLUS 30 DAYS) terms.  Payment shall be made in United States dollars and sent to Supplier or wired to a bank account pursuant to instructions provided by Supplier to Distributor.  Distributor will provide Supplier a current list of trade and bank references as well as the most recent audited financial statement upon execution of this agreement.  Distributor will provide yearly financial statements no later than the end of the 1st quarter of each subsequent year.  Distributor will provide Supplier any additional information to substantiate and maintain the credit line required to support the financial liability of the executed contract.

## ARTICLE 4
## WARRANTIES and RMA PROCESS

Section 4.01.    Warranty.  Supplier shall honor the terms of the "Novatel Wireless Limited Warranty and Liability," a copy of which is attached hereto as Exhibit F.  Supplier warrants that all Products, including components thereof, to be delivered hereunder, shall, at the time of delivery: (i) be new Products; (ii) be free from any material design defects, material defects in material and workmanship; and (iii) materially conform to the Specifications.  The foregoing warranty is given provided: (i) Distributor gives written notice of any defect, deficiency or non-conformance of any Product, or parts thereof, within Twenty-five (25) months from the date the Products are delivered to Distributor at Distributor's Facility, or (ii) Customer or an end-user gives written notice of any defect, deficiency or non-conformance of any Product, or parts thereof, within Twenty-four (24) months from the later of the purchase by Customer or an end-user of such Product, such date as evidenced by an activation of the product warranty through registration of the Product with Supplier within ten (10) days of purchase, or as evidenced by written proof of purchase or other commercially reasonable proof of the purchase date (the "Warranty Period").  The foregoing warranties do not extend to: (a) defects, errors or nonconformities in a Product due to accident, abuse, misuse or negligent use of such Product or use in other than a normal and customary manner, environmental conditions not conforming to Supplier's Specifications, or failure to follow prescribed operating or maintenance procedures; (b) defects, errors or nonconformities in the Product due to modifications, alterations, additions or changes in the Product not made or authorized to be made by Supplier in writing; (c) normal wear and tear; or (d) damage caused by force of nature or act of any third party.

Section 4.02.    RMA Process.   Upon execution of this agreement Supplier will supply Distributor with a pool of RMA units, 15 GPRS and 5 of each sku for CDPD the can be used to quickly swap out defective units in the field for customers. Distributor is to contact WDS in the UK for support and validation of defective units prior to taking a unit back from a customer. Distributor is to inspect all RMA units for excessive damage and is to test the unit(s) that they receive back for RMA replacement to confirm unit failure prior to shipping a replacement. If not, shipping of a replacement unit is at the Distributors risk of non-replacement. Supplier is to issue Distributor a credit memo for only the shipping cost of sending units back to Supplier for repair or replacement. Supplier is to turn the defective units within 10 days so Supplier has a supply of RMA units.   See a copy for RMA process attached hereto as Exhibit E.

Section 4.03.    Exclusive Remedy.   The warranty granted in this Section 4 sets forth Distributor's and Customer's sole and exclusive remedy and Supplier's sole and exclusive liability for any claim of warranty for any Product delivered by Supplier. Distributor acknowledges that it is not authorized to make any warranty or representation on behalf of Supplier regarding the Products, whether express or implied, other than the warranty terms set forth in this Section 4.

Section 4.04.    Intellectual Property.   Supplier warrants and represents that the Products, any other materials supplied by Supplier pursuant hereto and the Trademarks and designs used in connection therewith shall not infringe any proprietary right existing in the Territory.

Section 4.05.    Disclaimer of Warranties.   EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS, STATUTORY AND IMPLIED, APPLICABLE TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY THAT ANY PRODUCT IS DELIVERED FREE OF CLAIMS OF THIRD PARTIES BY WAY OF INFRINGEMENT OR THE LIKE. SUPPLIER FURTHER DISCLAIMS ALL EXPRESS, STATUTORY AND IMPLIED WARRANTIES APPLICABLE TO PRODUCTS WHICH ARE NOT MANUFACTURED BY SUPPLIER. THE ONLY WARRANTIES APPLICABLE TO PRODUCTS NOT MANUFACTURED BY SUPPLIER SHALL BE THE WARRANTIES, IF ANY, OF THE MANUFACTURER OF THOSE ITEMS.

Section 4.06.    Failure Rates.    If product the Supplier ships is deemed to exceed a 10% failure rate Supplier is to cover the shipping costs of returning the product back to Supplier's said return location and Supplier is to replace the defective units with new working product. Suppliers is to also cover the all "reasonable" shipping costs incurred by Distributor such as shipping from Distributor's warehouse to customer's location. Distributor is to present to Supplier proof of expense to obtain reimbursement and Supplier will only issue a credit for all and any reimbursements. No other expenses associated with the return of failed product will be reimbursed by Supplier and will be deemed as non-recoverable. Non-recoverable expenses are inclusive of any travel, telephone support, hand deliveries, etc.

## ARTICLE 5
## LIABILITY AND INDEMNITY

Section 5.01.    Intellectual Property Indemnity.   Supplier shall, at its sole cost and expense, indemnify, defend and hold Distributor and Distributor's Customers for Products harmless from all loss, expense or damages, of whatever nature, which may be incurred by Distributor or Distributor's Customers as a result

of any claims or actions for infringement of patents, copyrights, trademarks or similar proprietary rights that might be brought against Distributor or Distributor's Customers in connection with, or as a consequence of, the sale or use of Products, or such other materials supplied by Supplier pursuant hereto, in the Territory. That indemnification, without limitation thereto, shall include reasonable attorneys' fees and other costs of defense. The total amount of any such indemnity by Supplier shall in no event exceed a figure equal to twice the total of all amounts paid by Distributor pursuant to this Agreement. Distributor shall notify Supplier in writing of any such infringement claim within thirty (30) days of Distributor's initial awareness of such claim, and shall provide Supplier with such assistance and cooperation as Supplier may reasonably request from time to time in connection with the defense thereof. In the event Distributor determines that Supplier is unable or unwilling to defend the claim, Distributor may assume control of the defense of any infringement claim; provided that under such circumstances Distributor shall bear all costs of such defense (but not of any consequent judgment or liability). If any settlement requires an affirmative obligation of, results in any ongoing liability to, or prejudices or detrimentally impacts in any way, Distributor, then such settlement shall require Distributor's written consent.

Section 5.02.    Product Liability.  Supplier shall indemnify and hold Distributor harmless from all loss, expense or damages, of whatever nature, which may be incurred as a result of any claims or actions for negligence, whether active or passive, or for product liability of whatever specie, including, without limitation, claims or actions for strict liability, improper design or breach of warranty, express or implied, wherever such claims or actions may be asserted and regardless of where the events on which such claims or actions are based occurred, relating to the sale, furnishing or distribution of any Products. That indemnification shall include, without limitation, attorneys' fees and other costs of defense (including prosecution of necessary third-party actions). The Supplier, at its sole expense, shall defend all such claims and actions against the Distributor, whether brought informally or through court or administrative procedures; provided, however, that the Distributor shall be consulted regarding settlement of any such claim before a settlement agreement is finalized.  The obligation with respect to this Section 5.02 will not cover any claim that is a result of any quality or condition of or inherent defect introduced into any Products by way of any negligent or reckless acts of Distributor or its agents, employees, or representatives in combining any Products with any software or hardware not authorized or approved by Supplier.

Section 5.03.    Procedure.  Supplier's obligation to indemnify with respect to Section 5.01 will be subject to the following terms and conditions. The obligation will arise only if Supplier receives written notice of the infringement claim within thirty (30) days of Distributor's initial awareness of such claim. The obligation will not cover any claim that the Products infringe any third party's rights only when such Products are combined by Distributor or its agents, employees, or representatives with any software or hardware not supplied, authorized, or approved by Supplier.

Section 5.04.    Limitation of Liability.  EXCEPT WITH RESPECT TO SUPPLIER'S OBLIGATION TO INDEMNIFY DISTRIBUTOR FOR INTELLECTUAL PROPERTY AND PRODUCT LIABLILITY CLAIMS, NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST REVENUES OR PROFITS) OF ANY KIND DUE TO ANY CAUSE, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

Section 5.05.    Indemnification by Distributor.  Distributor agrees to indemnify and hold harmless Supplier against any damages, costs (including attorneys' fees and costs) or other liability arising from claims by any other party resulting from Distributor's express representation of the Products in a manner

CONFIDENTIAL                    DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

inconsistent with Supplier's Product descriptions and warranties or from Distributor's distribution of the Products.  Supplier shall have the right to participate at its expense in any such dispute.

## ARTICLE 6
## TERM AND TERMINATION

Section 6.01.    Term.  The distributorship created by this Agreement shall be effective for an initial term of two (2) calendar years from the date written on the signature page hereof.  The term shall be renewed for additional two (2) years periods upon prior written mutual consent of both Supplier and Distributor.  IF there is mutual written consent to not renew this agreement, Supplier must appoint another Distributor and will continue to not sell direct.

Section 6.02.    Termination.

A.    This Agreement may only be terminated for cause as set forth in this Section 6.02 or pursuant to Section 7.01.

B.    Either party may terminate this Agreement, effective upon the delivery of written notice of such termination to the other party, if: (i) the other party becomes insolvent, is generally not paying its debts as such debts become due, makes an assignment for the benefit of creditors, is the subject of any voluntary or involuntary case commenced under the federal bankruptcy laws, as now constituted or hereafter amended (which, in the case of involuntary bankruptcy, is not dismissed within days), or of any other proceeding under other applicable laws of any jurisdiction regarding bankruptcy, insolvency, reorganization, adjustment of debt or other forms of relief for debtors, has a receiver, trustee, liquidator, assignee, custodian or similar official appointed for it or for any substantial part of its property, or is the subject of any dissolution or liquidation proceeding; or (ii) there is a continued and material breach by the other party of any of the terms and conditions of this Agreement, provided that the party not at fault has given the other party thirty (30) days' prior written notice of such breach, such other party has not instituted reasonable efforts to remedy the breach and it is possible for the defaulting party to take such remedial action.

C.    Prior to the effective termination of this Agreement, all of the terms and conditions of, and the respective rights and obligations of the parties to, this Agreement will remain completely valid and enforceable.  These include, without limitation, Distributor's right to order Products from Supplier and to have those orders accepted up to such effective date of termination consistent with any other limitations herein, even though Supplier's actions taken with respect to such orders may take place after termination.

D.    The failure of either party to terminate the distributorship created by this Agreement or any extension thereof upon the occurrence of any event described in Section 6.02(b), shall not constitute a waiver of such party's right to terminate the distributorship created by this Agreement or any extension thereof upon any subsequent occurrence of any of those events.

Section 6.03.    Effect of Termination.

A.    Upon the expiration or termination of the distributorship created by this Agreement or any extension thereof for any reason, Distributor shall promptly: (i) return to Supplier, at Distributor's expense, all advertising and promotional materials, sales aids, written technical materials, engineering,

maintenance and operation manuals, drawings, plans, specifications and all other documents supplied by Supplier which are not required in the servicing of the Products purchased by Distributor prior to the termination or expiration date; and (ii) desist from advertising and holding itself out as an authorized Distributor of the Products.

B.      Following the expiration or termination of the distributorship created by this Agreement or any extension thereof, Supplier and Distributor shall perform all contracts for sale of Products executed between them prior to such expiration or termination.

C.      Notwithstanding anything to the contrary in this Agreement, no expiration or termination of this Agreement by either party shall affect any rights or obligations of either party (i) which are vested pursuant to this Agreement as of the effective date of such expiration or termination, or (ii) which are pursuant to ARTICLE 4 of this Agreement (with respect to Products still under warranty), or (iii) any other provisions intended by the parties to survive such expiration or termination.

Section 6.04.   Nonexclusive Remedy.   The right of either party to terminate is not an exclusive remedy, and either party shall be entitled, under appropriate circumstances, alternatively or cumulatively, to damages for breach of this Agreement, to an order requiring performance of the obligations of this Agreement, or to any other remedy available under the laws of any applicable jurisdiction.  [removed repurchase provisions; we do not repurchase product whose revenue we have already recognized].

## ARTICLE 7
## GENERAL

Section 7.01.   Force Majeure.   Neither party shall be liable for any delay or failure to perform hereunder due to floods, riots, strikes, freight embargoes, acts of God, acts of war or hostilities of any nature, laws or regulations of any government (whether foreign or domestic, federal, state, county or municipal) or any other similar cause beyond the reasonable control of the party affected.  A party relying on such an event to excuse its performance hereunder shall , as soon as reasonably possible, notify the other party in writing of the nature of that event and the prospects for that party's future performance and shall thereafter, while that event continues, respond promptly and fully in writing to all reasonable requests for information from the other party relating to that event and those prospects.  If performance by either party is delayed more than thirty (30) days due to such event or series of events, and commercially reasonable efforts have not been undertaken within that time to remedy the situation, the other party may rescind any outstanding orders and terminate this Agreement, effective immediately, without liability.

Section 7.02.   Waivers and Amendments.

A.      The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

B.      No amendment or waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against which it is sought to be enforced.

CONFIDENTIAL                    DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

Section 7.03.    Severability.  If any provision of this Agreement is held to be void, the remaining provisions shall remain valid and shall be construed in such a manner as to achieve their original purposes in full compliance with the applicable laws and regulations.

Section 7.04.    Sole Agreement.  This Agreement is intended to be the sole and complete statement of the obligations and rights of the parties as to all matters covered by this Agreement, and supersedes all previous understandings, agreements, negotiations and proposals relating thereto.

Section 7.05.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors.  This Agreement shall not be assigned by either party without the prior written consent of the other party. Except however, either party can assign this Agreement and its rights and obligations hereunder to a Subsidiary, without the consent of the other party, or pursuant to a merger or a purchase of all or substantially all of a party's assets.

Section 7.06.    Written Communications.  All notices, orders and other communications provided for hereunder shall be in writing and shall be delivered by mail, Email or Fax as to each party hereto, at its address set forth on the first page of this Agreement or at such other address as shall be designated by such party in a written notice to the other party.  All such communications shall be effective upon receipt.

Section 7.07.    Execution in Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

Section 7.08.    Effect of Headings.   The headings to the Articles, Sections and Exhibits of this Agreement shall not affect the construction of this Agreement.

Section 7.09.    Attorneys' Fees.  If either party commences any action or proceeding against the other party to enforce this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the other party the actual attorneys' fees, costs and expenses incurred by such prevailing party in connection with such action or proceeding and in connection with enforcing any judgment or order thereby obtained.

Section 7.10.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the Netherlands, excluding any conflicts of law rules requiring the application of the substantive law of any other jurisdiction. Any dispute, controversy, claim or civil action based upon, arising out of, or in any manner connected with this Agreement, its breach, or any of the transactions contemplated by this Agreement shall be commenced in and determined by the Amsterdam District Court.  Each of the parties to this Agreement (a) irrevocably and unconditionally consents and submits to the in personam jurisdiction of such courts in any such action, (b) consents to service of process in accordance with the rules governing proceedings in any such court, and (c) irrevocably waives and covenants not to assert any objection to the laying of venue in any such court in any such action.

Section 7.11    Third Party Beneficiaries.  Nothing contained in this Agreement, whether expressed or implied shall be deemed to confer any rights or remedies (including, without limitation, third party beneficiary rights) upon, or obligate either Supplier or Distributor to, any third person or entity. Notwithstanding the foregoing, each affiliate of Distributor operating in the Territory shall be permitted to issue Purchase Orders to Supplier for purchase of the Products, in which case such affiliate shall be deemed a "Distributor" with all rights and benefits under this Agreement, including the right to be directly invoiced by Supplier.

## ARTICLE 8
## QUIET PERIOD

Section 8.01    For a period of 6 months from the date of signing this agreement for CDPD and 6 months from the date of Operator Approval of the GPRS product (the "Initial Quiet Period"), Supplier will not alter this agreement to a non-exclusive arrangement and will enter into an agreement with another Distributor for the Customers or the Territory.

If during the Initial Quiet Period Distributor's activities lead to and/or assist in the achievement of at least one of the following milestones as described hereunder with respect to any Customer, the Initial Quiet Period will be extended, by an additional 3 months (the "Extended Quiet Period"):

(i)     Making a Sale, and/or

(ii)    The signing of a Letter of Intent or a Memorandum of Understanding between Distributor and such Customer regarding a purchase of one of the Products, and/or

(iii)   The implementation of a test installation of a Product at such Customer, and/or

(iv)    Demonstration satisfactory to Supplier of progress with respect to such Customer, and/or

(v)     Meeting the Sales Targets if set forth by Supplier.

If Distributor achieves any of the above-mentioned milestones during each of the relevant respective Quiet Periods for a Customer, Supplier will not alter this agreement and introduce another Distributor for the relevant Customer until the expiration or sooner termination of this Agreement.

If for any of the Customers, none of the above-mentioned milestones is achieved during the relevant Quiet Period, Supplier and Distributor will together review the reasons for this situation with that Customer. Supplier will thereafter have the right to decide, at its sole discretion, whether to continue Distributor's Quiet Period for the relevant Customer, and if no, for what length of time.

CONFIDENTIAL                    DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized representatives. Effective Date of the Agreement is   May, ____  2002.

"DISTRIBUTOR"

Israel Technology Trading Inc

By: Joe Shayovitch

Sign: _____

Date: _____

"SUPPLIER"

NOVATEL WIRELESS, INC.

By: _Melvin L. Flowers_

Sign: _____

Date: _____

CONFIDENTIAL                DISTRIBUTORNSHIP AGREEMENT DISTRIBUTOR ABC. – NOVATEL WIRELESS

# EXHIBIT "A"
## DISTRIBUTOR PRODUCTS AND PRICING

| SKU | PRODUCT | MSRP | DISTI COST |
|---|---|---|---|
| 649496 00377 7 | MINSTREL M500 CDPD | $ 469.00 | $ 235.00 |
| 649496 00276 3 | MINSTREL S2 NOVATEL PH1 CDPD | $ 469.00 | $ 235.00 |
| 649496 00174 2 | MINSTREL V NOVATEL DIRECT (PH2) CDPD *<br>20% Discount to Disti Cost will be applied for this item for VAT | $ 469.00 | $ 285.00 |
| 649496 00422 4 | MIN V ACCESSORY CASE CDPD | $ 39.00 | $ 16.00 |
| 649496 00257 2 | MINSTREL V CIGARETTE LIGHTER ADAPTER CDPD | $ 49.00 | $ 27.25 |
| 649496 00258 9 | MINSTREL V AC ADAPTER CDPD | $ 39.00 | $ 17.50 |
| 649496 00314 2 | ACCESSORY, MIN S/Min 540 AC ADAPTER CDPD | $ 39.00 | $ 17.50 |
| 649496 00396 8 | ACCESSORY, KIT HP FOOTMOUNT CDPD (MIN 540) | $ 29.00 | $ 10.00 |
| 649496 00159 9 | MERLIN CDPD | $ 359.00 | $ 180.00 |
| 649496 00436 1 | MERLIN PLATINUM W/O COMPRESSION CDPD | $ 399.00 | $ 200.00 |
| 649496 00388 3 | MERLIN PLATINUM CDPD | $ 399.00 | $ 259.00 |
| 649496 00437 8 | Merlin Platinum SE CDPD | $ 299.00 | $ 195.00 |
| 649496 00193 3 | REPLACEMENT ANTENNA (MERLIN CDPD) | $ 29.00 | $ 10.00 |
| 649496 00165 0 | CDPD MODEM 3-WATT INDIVIDUAL (Lancer) | $ 779.00 | $ 490.00 |
| 649496 00317 3 | Expedite CDPD | $ 230.00 | $ 160.00 |
| 01016449 | CABLE ASSY MMCX RG174 TNC 12 INCH | $ 30.00 | $ 15.00 |
| 649496 00486 6 | Merlin G201 PC Card | $ 499.00 | $ 246.00 |
| 649496 00467 5 | Headset for the G201 | $ 29.00 | $ 15.00 |
| N/A | Antenna w/Swivel Rotation GSM 900/1800 | $ 49.00 | $ 27.00 |
| N/A | Leather Storage Case for the Merlin unit | $ 10.00 | $ 6.75 |

## 25 units per SKU are minimum order quantities

CONFIDENTIAL                        DISTRIBUTORNSHIP AGREEMENT . – NOVATEL WIRELESS

# EXHIBIT "B"
## TERRITORY

**The State of Israel only.**

**Exceptions:**

**Lipman Engineering – Novatel Wireless sells direct to Lipman and reserve the right to continue this practice in the future.**

**Tritech – Novatel has a distributor agreement with Tritech for CDPD OEM Modules only.   Tritech will continue to have the right to represent our Products in Israel.**

CONFIDENTIAL

DISTRIBUTORNSHIP AGREEMENT . – NOVATEL WIRELESS

# EXHIBIT "C"
## TRADEMARKS

For purposes of this Agreement, each of the following shall constitute a Trademark:

Novatel Wireless
Minstrel
Merlin
Sage
Lancer

# EXHIBIT "D"
## ADVERTISING GUIDELINES

### Approved Joint Marketing Vehicles

Marketing vehicles with a specific call to action that drive Novatel Wireless product sales and brand building objectives will be eligible for co-op and MDF funds. All marketing vehicles must be pre-authorized by the Joint Marketing Program Administrator in order to be eligible for co-op. This includes receiving copies of proposed advertising material, copy, written plans for promotions, samples, etc. <u>one week</u> prior to a response due date. The following is a list of marketing vehicles that are approved for co-op and/or MDF marketing funds:

Media Advertising
> TV
> Radio

Print Advertising
> Product / Accessory Catalogues
> Newspaper
> Industry Publications

Electronic / Online Advertising
> eCommerce Sites
> Industry Specific Sites
> Telecom / Computer Portals
> Email Campaigns
> On-Hold Advertising

Outdoor Advertising
> Billboards
> Bus Benches
> Bus Wraps

Direct Mail
> Partner Direct Mail Pieces and Newsletters
> End-Users Direct Mail Pieces

Novatel Product Used for Promotional Purposes
> Drawing
> Demonstrations

Point of Purchase
> Posters

Flyers
Counter Cards
Danglers
Take-Ones

Events

Tradeshows
Conferences
Press Events
Speaking Engagements

## Unacceptable Marketing Vehicles

Vehicles that do not include a specific call to action, promote Novatel Wireless products or meet brand-building objectives are not acceptable.    Contact the Joint Marketing Program Administrator if you are not sure if a marketing initiative is acceptable.

## Fund Allocation

From time to time there may be events that Distributor may need marketing assistance and extra funds to participate in. All fund allocation decisions will be made by the Marketing Program Administrator and must be approved prior to the promotional activity.  All advertising materials that promote Novatel Wireless products must follow the Novatel Wireless Marketing Guidelines and Novatel Wireless Connected Guidelines in order to be eligible for reimbursement under this plan.

CONFIDENTIAL    DISTRIBUTORSHIP AGREEMENT . – NOVATEL WIRELESS

# EXHIBIT "E"
# RMA PROCEDURE



# EXHIBIT "F"
# WARRANTY

A true and accurate copy of the Novatel Wireless Limited Warranty and Liability is attached hereto.

Novatel Wireless Limited Warranty and Liability

Warranty period: Products & accessories - 2 years on the unit. All accessories and batteries - 90 days (in each case from the date of invoice). Novatel Wireless warrants that during the warranty period that (a) the Product will be free from defects in material and workmanship under normal use. THESE WARRANTIES ARE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

NOVATEL WIRELESS LIABILITY HEREUNDER IS EXPRESSLY LIMITED TO REFUND OF ALL AMOUNTS PAID TO NOVATEL WIRELESS FOR ANY DEFECTIVE UNITS OF PRODUCT, WHETHER NOVATEL WIRELESS LIABILITY ARISES FROM ANY BREACH OF ITS' EXPRESS WARRANTY, BREACH OF ANY OBLIGATION ARISING FROM BREACH OF WARRANTY, OR OTHERWISE WITH RESPECT TO THE MANUFACTURE AND SALE OF ANY UNITS OF THE PRODUCT, WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT PRODUCT LIABILITY. NOVATEL WIRELESS SHALL IN NO EVENT BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE DUE TO ANY CAUSE.

Purchaser's exclusive remedy for a claim under this warranty shall be limited to the repair or replacement, at Novatel Wireless' option, of defective or non-conforming materials, parts or components. The foregoing warranties do not extend to (I) non conformities, defects or errors in the Products due to accident, abuse, misuse or negligent use of the Products or use in other than a normal and customary manner, environmental conditions not conforming to Novatel Wireless' specification, of failure to follow prescribed installation, operating and maintenance procedures, (II) defects, errors or nonconformity's in the Product due to modifications, alterations, additions or changes not made in accordance with Novatel Wireless' specifications or authorized by Novatel Wireless, (III) normal wear and tear, (IV) damage caused by force of nature or act of any third person, (V) shipping damage, (VI) service or repair of Product by the purchaser without prior written consent from Novatel Wireless, (VII) products designated by Novatel Wireless as beta site test samples, experimental, developmental, reproduction, sample, incomplete or out of specification Products, or (VIII) returned products if the original identification marks have been removed or altered.

**Matthew A. Becker**

Subject: FW:

----- Original Message -----
**From:** Rand Effron
**To:** 'joes@wlius.com'
**Sent:** Tuesday, April 09, 2002 9:45 PM
**Subject:** Contract for your review

Joe . See requested changes and comments in parenthesis where change was not made . Comments are just for explanation will not be part of the agreement . If you agree we will make the changes in the agreement and resend it to you.

Section 1.07.      "Shipping Point" means Supplier's distribution facility located in Mexico
( could be Calgary or San Diego or any other facility in North America )

Section 1.08.   "Specifications" means those specifications for the Products set forth on the Novatel Wireless Website (www.novatelwireless.com) and on our data sheets.

Section 2.01.      Appointment and Exclusivity.  Subject to the terms, conditions and restrictions of this Agreement, Supplier hereby appoints Distributor as Supplier's **Exclusive** Master Distributor of Products

Section 2.03.      Advertising and Marketing.  Distributor shall be entitled, during the term of the distributorship created by this Agreement and any extension thereof, to advertise and hold itself out as an authorized Master Distributor of the Products, as set forth in Exhibit D.   ( NO COOP IN CONTACT.  COOP TAKEN OUT OF THE PRICE.)

Section 3.06.      Purchase Price.  The prices for the Products, together with any discounts applicable thereto, are set forth in Exhibit A.  All prices are F.O.B. Distributor.   ( Shipping is on Novatel.)

Section 3.08.  Packing.  Supplier shall, at its expense, pack all Products in accordance with Supplier's standard packing procedure, which shall be suitable to permit shipment of the Products to the Territory; provided, however, that if Distributor requests a reasonable modification of those procedures (unique packing out of Supplier's norm), Supplier quote Distributor the added cost and upon written approval, shall make the requested modification and Distributor may need to bear and pass on any reasonable expenses incurred by Supplier in complying with such modified procedures which are in excess of the expenses which Supplier would have incurred in following its standard procedures.

Section 3.09.   Title and Risk of Loss; Delivery.

A.    All deliveries of Products sold by Supplier to Distributor pursuant to this Agreement shall be made F.O.B. Distributor's Shipping Point and title to and risk of loss of Products shall pass from Supplier to Distributor at the Shipping Point.

Section 4.01.    Warranty. Supplier shall honor the terms of the "Novatel Wireless Limited Warranty and Liability," a copy of which is attached hereto as Exhibit F. Supplier warrants that all Products, including components thereof, to be delivered hereunder, shall, at the time of delivery: (i) be new Products; (ii) be free from any material design defects, material defects in material and workmanship; and (iii) materially conform to the Specifications. The foregoing warranty is given provided: (i) Distributor gives written notice of any defect, deficiency or non-conformance of any Product, or parts thereof, within Twenty-five (25) months from the date the Products are delivered to Distributor at Distributor's Facility, or (ii) Customer or an end-user gives written notice of any defect, deficiency or non-conformance of any Product, or parts thereof, within Twenty-four (24) months from

Section 4.02.    RMA Process. Upon execution of this agreement Supplier will supply Distributor with a pool of 15 RMA units the can be used to quickly swap out defective units in the field for customers. Distributor is to contact WDS in the UK for support and validation of defective units prior to taking a unit back from a customer. Distributor is to inspect all RMA units for excessive damage and is to test the unit(s) that they receive back for RMA replacement to confirm unit failure prior to shipping a replacement. If not, shipping of a replacement unit is at the Distributors risk of non-replacement. See a copy for RMA process attached hereto as Exhibit E

Section 4.06.  Failure Rates.   If product the Supplier ships is deemed to exceed a 10% failure rate Supplier is to cover the shipping costs of returning the product back to Supplier's said return location and Supplier is to replace the defective units with new working product. Suppliers is to also cover the all "reasonable" shipping costs incurred by Distributor such as shipping from Distributor's warehouse to customer's location. Distributor is to present to Supplier proof of expense to obtain reimbursement and Supplier will only issue a credit for all and any reimbursements. No other expenses associated with the return of failed product will be reimbursed by Supplier and will be deemed as non-recoverable. Non-recoverable expenses are inclusive of any travel, telephone support, hand deliveries, etc.

Section 7.10.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Netherlands, ( this is our standard wording for international distributors . All we are saying is that if worst comes to worst we don't want to litigate with you in Israel but on a neutral ground. If you prefer the governing law of CA , USA it goes without saying we don't need to make any changes for that ITT and Novatel are US companies ).

Section 8.01    For a period of 6 months from the date of the signing of this agreement (the "Initial Quiet Period"), Supplier will not alter this agreement to a non-exclusive arrangement and will enter into an agreement with another Distributor for the Customers or the Territory.

If during the Initial Quiet Period Distributor's activities lead to and/or assist in the achievement of at least one of the following milestones as described hereunder with respect to any Customer, the Initial Quiet Period will be extended, by an additional 3 months (the "Extended Quiet Period"):

(i)    Making a Sale, and/or

(ii)   The signing of a Letter of Intent or a Memorandum of Understanding between Distributor and such Customer regarding a purchase of one of the Products, and/or

    (iii)        The implementation of a test installation of a Product at such Customer, and/or

    (iv)        Demonstration satisfactory to Supplier of progress with respect to such Customer, and/or

    (v)        Meeting the Sales Targets if set forth by Supplier.

If Distributor achieves any of the above-mentioned milestones during each of the relevant respective Quiet Periods for a Customer, Supplier will not alter this agreement and introduce another Distributor for the relevant Customer until the expiration or sooner termination of this Agreement.

If for any of the Customers, none of the above-mentioned milestones is achieved during the relevant Quiet Period, Supplier and Distributor will together review the reasons for this situation with that Customer. Supplier will thereafter have the right to decide, at its sole discretion, whether to continue Distributor's Quiet Period for the relevant Customer, and if no, for what length of time.

Section 8.02 During the Quiet Period the Supplier will not sell directly to the Customers in the Territory. ( this is all I could get for you if you want to call John fine by me )

3/4/05

## Matthew A. Becker

**From:** Joe [Jwli@conversent.net]
**Sent:** Thursday, January 06, 2005 5:27 PM
**To:** Matthew A. Becker
**Subject:** Fw: Our Distribution Agreement

----- Original Message -----
**From:** joe Shayovitch
**To:** Ryan Sawatzky
**Cc:** John Major
**Sent:** Wednesday, December 11, 2002 9:50 PM
**Subject:** RE: Our Distribution Agreement


John and  Ryan ,

Thanks , I am sure you know that you will not regret it .

Ryan , please make sure to update our file with this .

Regards
Joe



---- Original Message -----
**From:** "Ryan Sawatzky" <RSawatzky@novatelwireless.com>
**To:** "'Joe Shayovitch'" <joes@wlius.com>
**Cc:** "John Major" <jmajor@novatelwireless.com>
**Sent:** Wednesday, December 11, 2002 2:56 PM
**Subject:** RE: Our Distribution Agreement

Joe ,

I discussed with John and we agree to extend the
distribution agreement with an additional two years .

Ryan

-----Original Message-----

**From:** Joe Shayovitch
**To:** Ryan Sawatzky
**Cc:** John Major
**Sent:** Wednesday , December 04, 2002 8:36 AM
**Subject:** RE: Our Distribution Agreement


Ryan

Tanks but no thanks , as I said no point to
make the tremendous investment in
certification and promotion for less the 4

3/4/05

years exclusive .
You can set  milestones witch is fine but if
you do the milestones  must be linked to
modem quality and availability . Without
Novatel providing a quality product that can
pass certification there will be delays and
there  is not much we can do .

I can discuss it directly with John as he set
me up with this deal but I really don't want to
go forward with the G301 certification
without a reasonable chance to return my
 investment .
Even if the effort is half of the one made for
the G201 even then it is still a major
investment .

No need to rush , lets have a conference
call when you are back from Europe .

Regards
Joe


----- Original Message -----
**From:** "Ryan Sawatzky"
<RSawatzky@novatelwireless.com>
**To:** '"Joe Shayovitch "' <joes@wlius.com,
**Cc:** "John Major"
<jmajor@novatelwireless.com>;
**Sent:** Tuesday, December 03, 2002 6:07
PM
**Subject:** RE: Our Distribution Agreement

Joe,

John and I agree that you
have a valid point , we
suggest a one year
extension to your distribution
agreement.

Ryan

-----Original Message-----
**From:** Joe Shayovitch
**To:** Ryan Sawatzky
**Cc:** John Major
**Sent:** 12/3/02 11:13 PM
**Subject:** RE: Our
Distribution Agreement

OK , thanks



-
-
-
-
-
Original
Message
-
-
-
-
-
**From**:
"Ryan
Sawatzky"
<RSawatzky@novatelwireless.com>
**To:**
'"Joe
Shayovitch
'"
<joes@wlius.com>
**Cc**:
"John
Major"
<jmajor@novatelwireless.com>
**Sent:**
Tuesday,
December
03,
2002
4:05
PM
**Subject:**
RE: Our
Distribution
Agreement

Joe,

I
am
in
Europe,
I
will
discuss
it
with
John
and
will
get
back
to
you .

Ryan

-
-
-
-
Original
Message
-
-
-
-
-
**From**:
Joe
Shayovitch
[mailto:joes@wlius.com]
**To**:
John
Major;Ryan
Sawatzky
**Sent**:
Tuesday,
December
03,
2002
7:36
AM
**Subject**:
Our
Distribution
Agreement

Hi
John
and
Ryan ,

When
we
signed
our
distribution
agreement
I
had
no
idea
what
it
takes
to
certify
a
modem .
I
was
told

4
-
6
weeks .
Well
now
I
know
*it takes*
4
-
6 months .
Perhaps
part
of
the
problem
is
that
the G201
is
not
cooked with
lots
of
bugs .In
any
case
the
end
result
is
that
we
have
spend
a
tremendous
amount
of
time
on
getting
the
G201
certified
with
Cellcom
and
Orange .
Now
that
we
have
it
certified
and
ready
to
collect
orders

the
fruits
of
our
investment
the
G201
is
practically
obsolete
and
there
is
a
new
modem
the
G301
to
be
certified .
Now
we
need
to
make
the
same
investment
all
over
again and
this
just
does
not
make
business
sense
for
us .
To
make
such
a huge
investments
in
Novatel
certification
without
having
a
longer
period of exclusivity
in
the
Israeli
market
so
we
can

have
a
reasonable
return
on
our
investment
is
just
bad
business .

On
this
background
I
am
asking
you
to
extend
our
distribution
agreement
with
an
additional
4
years
under
the
same
terms
and
conditions.
You
already
know
what
my
company
can
do
for
you
and
you
see
results .In
just 6
months
we
certified
the
G201
with
two
operators,
we have
firm
orders

from
both
and
fixed
with
Cellcom
a
long
on
going
customer
dissatisfaction caused
by
 Novatel
Luck
of
CDPD
support .

In
any
case
if
you
don't
want
to
extend
the
distribution
agreement
I
understand
but
in
such
case
we
wish
not
to
take
on
the
certification
of
the
G301
if
you
want
Novatel
can
do
it
direct
with
the
operators .
This
just

does
not
make
business
sense
for
us .

I
believe
it
is
a
Novatel
interest
to
have
a
solid
distributor
in
Israel
that
has
a
long
term
view
making
the
necessary
investments
to
get
the
Novatel
brand
rolling .

As
we
need
to start
on
the
G301
certification
with
both
operators
please
let
me
know
of
your
decision
as
soon
as
possible .

Regards
Joe

ORIGINAL

JS-44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

FILED

**I (a) PLAINTIFFS**

Israel Technology Trading, Inc., a
Delaware Corporation

**DEFENDANTS**

Novatel Wireless, Inc., a Delaware Corporation, and
0 Does 1-10, inclusive

'05 CV 0436   BEN (JFS)

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIF
DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Bergen, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

The Law Office of Matthew A. Becker, PC
1003 Isabella Ave., Coronado, CA 92118
(619) 522-6760 phn / (619) 522--6763 fax

**ATTORNEYS (IF KNOWN)**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)          FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

False Advertising - Lanham Act 43(a)(1)(B)          28 :1331  GP

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $**
Damages according to Proof

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE _____   Docket Number _____

DATE   March 4, 2005          SIGNATURE OF ATTORNEY OF RECORD.   Matt A. Beck

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PD $ 250.00  3/4/05  #111681  KB